Stanley Goff, Bar No. 289564
15 Boardman Place Suite 2
San Francisco, CA 94103
Telephone: (415) 571-9570
Email: scraiggoff@aol.com

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHARLES HEARD,**<br><br>　　Plaintiff,<br><br>v.<br><br>**CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO, SERGEANT DAMON JACKSON and DOES 1-50**<br><br>　　Defendants. | **CASE NO. 3:21-CV-09472-JSC**<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br>**1. Violation of Plaintiff's Fourth Amendment Rights 42 U.S.C §1983 (Malicious Prosecution)**<br><br>**2. Violation of Plaintiff's Fourteenth Amendment Rights 42 U.S.C §1983 (Brady Violation)**<br><br>**3. Violation of Plaintiff's Fourth Amendment Rights 42 U.S.C §1983 (Fabrication of Evidence)**<br><br>**4. Municipal Allegations** |

Plaintiff, demanding a jury trial, brings this action against Defendants CITY AND COUNTY OF SAN FRANCISCO and SAN FRANCISCO POLICE SERGEANT DAMON JACKSON AND DOES 1-50, inclusive, for general, consequential, compensatory, punitive and statutory damages, costs and attorneys' fees resulting from defendants' unconstitutional and tortious conduct, and as grounds therefore allege as follows:

## I.PARTIES

1. Plaintiff Charles Heard, was at all times relevant to this complaint, living in the City and County of San Francisco, which is located within the Northern District of California.

2. Defendant City and County of San Francisco is a municipal corporation, duly organized and existing under the laws of the State of California. At all material times, the City and County of San Francisco was responsible for supervising, enacting, and enforcing SFPD's conduct, policies, and practices; the absence of needed policies and practices; and for the hiring, retention, supervision, and training of employees and agents of SFPD.

3. At all material times herein, Defendant Sergeant Damon Jackson was employed by Defendant City and County of San Francisco and was acting within the course and scope of that employment during all times relevant to this complaint. He is being sued in his individual capacity.

4. The true names and capacities, whether individual, corporate, associate or otherwise, of defendants Does 1 through 50 inclusive, are unknown to the plaintiff, who therefore sue said defendants by such fictitious names. Defendants DOES 1 through 50, and each of them, were responsible in some manner for the injuries and damages alleged herein. Plaintiff is informed and

believes and thereupon alleges that each of them is responsible for the injuries and damages alleged herein. These Defendants are being sued in their individual capacities.

5. All Defendants acted under color of law.

## II. JURISDICTION AND VENUE

**6.** This action is brought pursuant to 42 U.S.C. §§ 1983, 1988 and 12132 and the Fourth and Fourteenth Amendments to the United States Constitution, made applicable to Defendants through the Fourteenth Amendment to the United States Constitution. This Court has jurisdiction over plaintiffs' claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to this action occurred in the City and County of San Francisco, which is located in this district.

## III. STATEMENT OF FACTS

7. This case arose out of the fatal shooting of Richard Barrett on the southeast corner of Broadway and Kearny Street in the North Beach area of San Francisco in the early morning hours of November 25, 2008. Testimony from several witnesses established that two African American men approached Barrett, a brief scuffle ensued, Barrett broke away and ran a short distance while being pursued by one of the assailants who had a gun, and that assailant shot Barrett twice in the back, killing him.

8. In late December 2008 or early January 2009, Jackson and several other Western Addition Gang Task Force members had been called to the district attorney's office to view the video footage, which had recently been obtained in connection with the investigation of the Barrett homicide.

9. These particular investigators were asked to participate because they were the ones who would be able to identify Western Addition suspects.

10. At that meeting in the district attorney's office with an investigator from the District Attorney's office, the Gang Task Force investigators viewed the video footage of the two perpetrators on a computer monitor.

11. The individuals who Detective Jackson believed it could have been in the video were Dennis Anderson and Gregory Walker. Jackson's identification of the perpetrators in the video *was never disclosed* by Jackson or any investigators from the District Attorney's office who were at that investigation meeting, to the Plaintiff or his criminal defense attorneys during his criminal prosecution or at his trial.

12. On January 8, 2009, six weeks after the shooting, an officer showed a photo lineup to Francis Smith, a tourist who had a fleeting glimpse of the shooter as she was smoking outside the bar at her home in Texas. Although Smith did not identify anyone in the first group of photos, she identified the Plaintiff in the second group of photos. She felt 95 percent sure or "pretty sure," but she would have felt 100 percent sure if the Plaintiff's mouth were open in the photo and she were to see gold on his teeth.

13. The Plaintiff was subsequently arrested in June of 2009 and charged with the murder of Barrett. Smith testified at the Plaintiff's preliminary hearing on October 8 and 9 2009, more than ten months after the shooting. Smith identified Plaintiff as the shooter. Plaintiff opened his mouth and displayed gold crowns on his teeth, making Smith feel 100 percent sure that he was the shooter. At trial, Smith again identified Plaintiff as the shooter.

14. Smith also viewed the surveillance video footage of the two assailants. Smith identified one person as the shooter, contending she recognized his clothing but not his face. Smith's description of the shooter to police had significant discrepancies from the surveillance footage. Smith told police the shooter wore "plaid and gray, white or black and white pants," a plaid

Kangol hat that matched his pants, and a graffiti shirt with a short-sleeve overshirt.

15. At trial, Smith acknowledged that the videos showed the person she identified as the shooter wore a hoodie that was not short-sleeved, blue jeans, and no hat. Another eyewitness, Duane Reeves, chose Plaintiff's photo from a lineup and told police he "favored" or "resembled" one of the two perpetrators but did not identify him.

16. The Plaintiff's attorneys presented expert testimony to show that the person who Smith identified in the video as the shooter was unlikely to be Plaintiff, because of significant differences between measurements taken from photos of appellant and measurements taken from images of the perpetrator's face in the video. The defense repeatedly sought the trial court's permission to display photos of two third party suspects -- Dennis Anderson and Gregory Walker -- so that the jury could decide whether they appeared to be the two perpetrators in the videos.

17. The defense maintained that Anderson and Walker had a much stronger resemblance to the perpetrators than Plaintiff. The defense also noted a recent interview of a police informant identifying Anderson as the shooter. The court found the evidence was inadmissible and excluded the photos of Anderson and Walker.

18. The jury deliberated for nine days before returning a verdict, finding Plaintiff guilty of first-degree murder and attempted second-degree robbery, but failing to return a verdict on the charge of possession of a firearm by a felon. The jury further found not true the allegation that Plaintiff personally and intentionally discharged a firearm. The prosecution's case rested in large part on the eyewitness testimony of Francis Smith

19. Years after his state conviction was upheld on appeal, Plaintiff was charged in a multi-defendant federal gang conspiracy case, with the Barrett murder alleged as an "overt act" in support of that conspiracy.

20. During the federal trial, the defense elicited the testimony of San Francisco Police Sgt. Damon Jackson, the prosecution's own gang expert. Jackson, who did not testify in the state trial. Jackson was re-shown the same surveillance video of Barrett's two assailants that he viewed at the District Attorney's office in late 2008.

21. Jackson testified that he was very familiar with both men depicted because of his years of experience with Western Addition gangs, and they were ***Dennis Anderson and Gregory Walker,*** not the Plaintiff Charles Heard.

22. On November 20, 2018, based on the testimony of Jackson at his federal trial, Plaintiff filed a petition for a writ of habeas corpus alleging, inter alia, that new evidence established that Plaintiff was neither of the two perpetrators in the Barrett robbery and homicide, that he hadn't committed those crimes, and that his rights under ***Brady v. Maryland*** had been violated.

23. The Brady claim and the claim of new evidence under section 1473, subdivision (b)(3)(A) were based on Defendant Jackson's federal trial testimony that the two perpetrators captured on the video surveillance footage were Walker and Anderson, not the Plaintiff. On January 25, 2019, the court issued an order to show cause, finding that Plaintiff had established a prima facie case as to the new evidence claim and the Brady claim.

24. At this post state conviction hearing, Jackson testified at length about his many years of experience as a police officer in the Western Addition and Fillmore neighborhoods and, later, as a member of SFPD's Gang Task Force focusing on the Western Addition and Fillmore gangs.

25. Jackson testified that he has known Plaintiff since 2006 or 2007 and had encountered him many times over the years in various areas of San Francisco, and that he saw Plaintiff and spoke with him on the street in consensual encounters and in the course of criminal investigations and arrests and had also viewed him many times in photos and video footage.

26. Jackson also testified that he was equally familiar with Anderson and Walker. He had known them since around 2005 and had seen and spoken with them several times. He had seen the men in photos, in videos and encountered them on the streets for many years and acknowledged being "very familiar" with all three men.

27. At this post state conviction hearing, Jackson was again shown the video surveillance footage of the two perpetrators and Jackson again testified that they were Walker and Anderson, not the Plaintiff.

28. Jackson testified that he was "confident and with 100 percent accuracy that those people are who I've identified them to be."

29. On March 13, 2020, the Court found that Plaintiff had carried his burden on the Brady issue. The court made a series of factual findings in support of its finding. Regarding Smith's testimony, the court found: "This is a case where there is an eye-witness who identified Mr. Heard as the gentleman who fired the gun, committed the homicide, and I don't discount that. That could be very powerful evidence, but even at trial it was attacked using the science that has been developed about eye-witness testimony."

30. The court noted the jury had struggled with Smith's identification, finding it significant that the jury returned a not true finding on the personal use of a firearm enhancement "which suggests that they had some trouble with [Smith's identification] themselves." The court further stated: "This is a case where it was believed that the two men depicted in the video were responsible for the homicide. If a member of the Gang Task Force had a hundred percent belief that those two men were Walker and Anderson and not Heard, that's plainly material; it's plainly exculpatory."

31. The court recognized *the "powerful" impact Jackson's testimony could have had at trial:* "[I]f a defense attorney calls a currently employed sergeant of police and gets evidence that's favorable to the defense from them, that's a showstopper at the trial[.]"

32. The court specifically found Jackson's identification of Anderson and Walker to be "very convincing and credible:" "Coming into this proceeding I was skeptical about this claim. That was in part because all I had was this very brief transcript from Sergeant Jackson in the federal trial. But once I heard him and heard his extensive history in the Western Addition as a patrol officer, as a detective, as a member of the Gang Task Force and his daily contact with Mr. Heard, Mr. Anderson, Mr. Walker, and the other people who live in that neighborhood, I found his identification of those two men very, very convincing and credible. And I can only imagine that a panel of lay people empaneled on a jury would have as well."

33. Based on the Brady violation, the Court granted the petition for writ of habeas corpus and vacated the judgment and sentence. The prosecution elected not to retry Plaintiff for the Barrett murder.

## V. CAUSES OF ACTION

**FIRST CLAIM**
**(42 U.S.C. Section 1983 MALICIOUS PROSECUTION)**
**(Against all named Defendants against San Francisco)**

34. PLAINTIFF re-alleges and incorporate by reference paragraphs 1 through 33 of this Complaint.

35. The Defendant Jackson and DOE's 1-49 acting with malice, caused the initiation of false charges to be filed against the Plaintiff subjecting the Plaintiff to malicious prosecution which deprived him of his right to be free from unreasonable seizure of his person under the Fourth Amendment to the United States Constitution.

36. The DOE District Attorney Investigator in their investigative capacity, acting with malice, caused the initiation of false charges to be filed against the Plaintiff subjecting the Plaintiff to malicious prosecution which deprived him of his right to be free from unreasonable seizure of his person under the Fourth Amendment to the United States Constitution.

37. That the Defendants were actively involved in causing the Plaintiff to be prosecuted for the charge of murder.

38. That the criminal proceedings regarding this charge and murder conviction ended in Plaintiff's favor when his conviction was vacated.

39. That no reasonable person in the Defendants' same position would have believed that there were grounds for causing the Plaintiff to be arrested and prosecuted based on the above-listed charge because the Defendants had knowledge that someone other than Plaintiff committed the murder.

40. That the Defendants acted primarily for a purpose other than to bring the Plaintiff to justice because they had knowledge that the Plaintiff had not committed the murder of Barrett, and yet arrested the Plaintiff and charged him with this crime anyway.

41. That the Plaintiff was harmed based on this malicious prosecution because he was incarcerated (loss of his liberty) and

42. That the Defendants' conduct was a substantial factor in causing Plaintiff's harm.

# SECOND CLAIM
## (42 U.S.C. Section 1983 BRADY)
### (Against all named Defendants against San Francisco)

43. PLAINTIFF re-alleges and incorporate by reference paragraphs 1 through 42 of this Complaint.

44. That the Defendants Damon Jackson and DOE's 1-49 withheld exculpatory evidence from the Plaintiff that was material to his defense to the prosecution for murder, thus depriving the Plaintiff of his right to due process under the Fourteenth Amendment to the United States Constitution.

45. That DOE District Attorney investigator in their investigative capacity obtained and then withheld exculpatory evidence from the Plaintiff that was material to his defense to the prosecution for murder, thus depriving the Plaintiff of his right to due process under the Fourteenth Amendment to the United States Constitution.

46. That this exculpatory evidence that neither of the two assailants on the video footage, who were responsible for the murder of Barrett were the Plaintiff was highly favorable to exculpation or impeachment of Francis Smith in the Plaintiff's criminal case.

47. That this exculpatory evidence was never disclosed to any member of the San Francisco District Attorney's office in their *prosecutorial capacity* of the Plaintiff's prosecution for murder.

48. That this exculpatory evidence was never disclosed to any member of the Plaintiff's criminal defense team during the Plaintiff's prosecution for murder or after his subsequent conviction for this murder charge while he unsuccessfully appealed his murder conviction.

49. That the Defendants' withholding of this exculpatory evidence was highly prejudicial to the Plaintiff and severely hampered his ability to adequately defend against his criminal charges.

50. That this withheld evidence could have reasonably been used to put the whole case in such a different light as to undermine confidence in the jury verdict that was rendered.

51. That Defendants acted with deliberate indifference or reckless disregard of the consequences in withholding this material, favorable evidence.

52. That the Plaintiff was harmed by this BRADY VIOLATION because he was forced to endure the emotional distress of being prosecuted for a crime that he did not commit and suffering incarceration (loss of his liberty) as a result; and

53. That the Defendants' conduct was a substantial factor in causing Plaintiff's harm.

### THIRD CLAIM
**(Violation of Plaintiff's Rights Pursuant to 42 U.S.C §1983 (Fabrication of Evidence) – As to all named Defendants against San Francisco)**

54. PLAINTIFF re-alleges and incorporate by reference paragraphs 1 through 53 of this Complaint.

55. That Defendant Jackson and DOEs 1-49, acting under color of law, engaged in the fabrication of evidence by continuing the investigation and prosecution of the Plaintiff despite knowing Plaintiff was innocent due their knowledge of the falsity of Smith's identification of Plaintiff as being involved in the murder of Barrett.

56. That DOE District Attorney Investigator in their investitive capacity, acting under color of law, engaged in the fabrication of evidence by continuing the investigation of the Plaintiff for murder, despite knowing Plaintiff was innocent due their knowledge of the falsity of Smith's identification of Plaintiff being involved in the murder of Barrett.

57. Such actions were in conscious and reckless disregard of the risk of injury and under the circumstances, there was no objectively reasonable basis for the Defendants' actions.

58. That the Plaintiff was harmed based on this fabricated evidence because he was forced to endure the emotional distress of being prosecuted for a crime that he did not commit and was incarcerated (loss of his liberty); and

59. That the Defendants' conduct was a substantial factor in causing Plaintiff's harm.

## MUNICIPAL ALLEGATIONS

60. The City and County through the San Francisco Police Department has policies and customs of violating the Fourteenth Amendment Rights of its citizens by withholding material exculpatory evidence.

61. That over the last 10 years, there have been numerous incidents of Brady violations, taking place in violation of the U.S. Constitution, making these constitutional violations foreseeable.

62. That these foreseeable constitutional violations were made possible and in fact were authorized and encouraged by SFPD's lack of any written policy whatsoever governing or guiding this conduct. This lack of written policy resulted in the arbitrary and punitive application of this conduct against citizens peacefully assembled in lawful protest.

63. This failure is compounded by the fact that no tracking system exists to determine when, and how often these Brady and Tatum violations take place by San Francisco police officers. As such any oversight or review of the conduct engaged by the Defendants will rely exclusively on records generated by the very officers who engaged in this conduct in the first place.

64. SFPD has no tracking system to determine which officers engage in Brady violations. In the absence of such a report SFPD has no way to track Brady violations by which officers under what circumstances. This encourages and leads directly to the indiscriminate use of these constitutional violations against criminal suspects.

65. It is entirely foreseeable that police officers acting on their own with no policies to guide them in the handling of Brady material will lead to constitutional violations.

66. Despite this patently obvious risk, SFPD has unleashed, untrained, overworked, and unbridled officers in the handling of Brady materials.

67. The City and County of San Francisco has failed to train and/or has inadequately trained its police officers in their duties regarding Brady materials and the handling and disclosure of such materials. The consequences of this lack of training are plainly obvious. This is further demonstrated by the widespread Brady violations that have affected San Francisco criminal defendants within the last 10 years.

68. Defendant SAN FRANCISCO deprived Plaintiff of his rights, privileges, and immunities secured by the United States Constitution by, among other things, does not train, or inadequately trains its officers regarding the handling of citizens, so that the officers will not omit material exculpatory information from police reports within the last ten years.

69. Cases involving San Francisco Police Officers withholding exculpatory evidence in the last 12 years:

*Trulove v. City of San Francisco*

*Tennison v. City of San Francisco*

67. Furthermore, within the last ten years, SAN FRANCISCO has had a widespread or longstanding custom and practice of allowing its law enforcement employees to engage in the falsifying of police reports, together with its lack of, or inadequate, training amounts to deliberate indifference towards the constitutional rights of individuals.

68. As a direct result of the named DEFENDANT SAN FRANCISCO actions and inactions, Plaintiff's constitutional rights were violated, resulting in Plaintiff's injuries.

69. The conduct of Defendants as alleged, was intended to cause injury to Plaintiff and was done in conscious disregard of Plaintiff's rights and safety and thus constitutes malice.

70. Because the above acts were performed in a malicious, and/or oppressive manner, Plaintiff is entitled to recover punitive damages from Defendants in an amount according to proof.

## VI. PRAYER FOR RELIEF

Plaintiffs pray for judgment against defendants as follows:

1. For compensatory damages and other special damages according to proof;
2. For general damages according to proof;
3. For punitive damages against all individual defendants according to proof;
4. The prejudgment interest at the legal rate according to proof;
5. For costs and reasonable attorneys' fees as provided by law; and
6. For such other relief as the Court may deem fit and proper.

## VII. JURY DEMAND

Plaintiffs demand a jury trial in this action.

LAW OFFICE OF STANLEY GOFF

Dated: April 21, 2022          _____/s/ STANLEY GOFF_____
STANLEY GOFF
Attorney for Plaintiff