UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES HEARD,<br><br>   Plaintiff,<br><br>   v.<br><br>DAMON JACKSON, et al.,<br><br>   Defendants. | Case No. 21-cv-09472-JSC<br><br>**ORDER GRANTING IN PART MOTION TO DISMISS**<br><br>Re: Dkt. No. 27 |

Plaintiff Charles Heard brings claims against Defendants Damon Jackson and the City and County of San Francisco (the "City") under 42 U.S.C. § 1983 ("Section 1983"). (Dkt. No. 26.[1]) Plaintiff alleges that Defendants violated his rights under the Fourth and Fourteenth Amendments. Before the Court is Jackson and the City's motion to dismiss. (Dkt. No. 27.) Plaintiff opposes. (Dkt. No. 28.) After carefully considering the briefing and having had the benefit of oral argument on June 30, 2022, the Court GRANTS in part and DENIES in part Defendants' motion to dismiss for the reasons explained below.

**BACKGROUND**

**I.   Complaint Allegations**

Witnesses saw two men confront Richard Barrett in the North Beach area of San Francisco. (Dkt. No. 26 ¶ 7.) After a brief scuffle, Barrett ran away. (*Id.*) One assailant, armed with a gun, pursued Barrett. (*Id.*) The armed assailant shot Barrett twice, killing him. (*Id.*) After a seven-month investigation, the police arrested Charles Heard for Barrett's murder. (*Id.* ¶ 13.)

   **A.   The Investigation and Trial**

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

1   During the investigation, the police obtained video footage of the two suspects in Barrett's
2   murder. (*Id.* at 8.) Defendant Jackson is a sergeant in the San Francisco Police Department
3   ("SFPD"). (*Id.* at 3.) At the time of Barrett's murder, Jackson worked on the Western Addition
4   Gang Task Force. (*Id.* at 8.) Jackson was "called to the district attorney's office to view the video
5   footage" because he could identify "Western Addition suspects." (*Id.* at 8–9.) An investigator
6   from the District Attorney's office was present at that meeting. (*Id.* at 10.)

7   Jackson "believed" that the suspects in the video could be two men—Derrick Anderson
8   and Gregory Walker. (*Id.* at 11.) "Jackson's identification of the perpetrators in the video was
9   never disclosed by Jackson or any investigators from the District Attorney's office who were at
10  that investigation meeting, to the Plaintiff or his criminal defense attorneys during his criminal
11  prosecution or his trial." (*Id.* ¶ 11.)

12  The police also interviewed a witness who "had a fleeting glimpse of the shooter." (*Id.* at
13  12.) The witness noted that the shooter had gold teeth. (*Id.*) She then examined a photo lineup of
14  possible suspects in the Barrett murder investigation. (*Id.*) She identified a photo of Heard as the
15  shooter. (*Id.*) She stated that she felt "95 percent sure" of her identification, but she would feel
16  100 percent sure if she could see his teeth in the photo. (*Id.*)

17  Based on this witness's testimony, the police arrested Heard and charged him with
18  Barrett's murder. At the preliminary hearing, the witness identified Heard as the shooter after
19  Heard opened his mouth and displayed gold crowns on his teeth. (*Id.* ¶ 13.) The witness felt "100
20  percent" sure Heard was the shooter. (*Id.*) Another witness chose Heard's photo from a photo
21  lineup and told police he "resembled" one of the perpetrators. (*Id.*)

22  At trial, Heard maintained that he was not either perpetrator in the video. (*Id.* ¶ 17.)
23  Jackson never testified at Heard's trial. (*Id.* ¶ 20.) Because a police informant suggested that
24  Derrick Anderson had been the shooter, Heard attempted to introduce a photo of Anderson. (*Id.*
25  ¶ 17.) The trial court excluded the photo. (*Id.*)

26  The jury found Heard guilty of first-degree murder and attempted second-degree robbery
27  but failed to return a verdict on "possession of a firearm by a felon." (*Id.* ¶ 18.) The jury found
28  "not true" the allegation that Heard "personally and intentionally" discharged a firearm. (*Id.*)

### B. Post-Conviction Proceedings

Roughly ten years later, Plaintiff was charged in a "multi-defendant federal gang conspiracy case." (*Id.* ¶ 19.) The government alleged that Barrett's murder was an "overt act" in support of the conspiracy. (*Id.*) During the federal trial, Jackson testified as the prosecution's "gang expert." (*Id.*) Jackson viewed the same surveillance footage that he viewed in the Barrett investigation. (*Id.* ¶ 20.) Jackson identified the suspects as Dennis Anderson and Gregory Walker. (*Id.* ¶ 21)

Based on Jackson's testimony in the federal trial, Heard filed a petition for a writ of habeas corpus. (*Id.* ¶ 22.) At an evidentiary hearing on the habeas petition, Jackson testified that he had known Heard, Anderson, and Walker for many years. (*Id.* ¶¶ 25–27.) Jackson testified that he was "confident" with "100 percent accuracy" that Anderson and Walker were the men in the Barrett murder video footage. (*Id.* ¶ 28.)

The reviewing court found that Plaintiff had carried his burden to show a violation of his rights under *Brady v. Maryland*, 373 U.S. 83 (1963). (*Id.* ¶ 29.) The court found that Jackson's identification was "plainly material" and "plainly exculpatory." (*Id.* ¶ 30.) As a result, the court vacated Heard's conviction. The prosecution declined to retry the case. This civil lawsuit under Section 1983 followed.

### DISCUSSION

Heard brings this lawsuit against Jackson and the City under Section 1983. "Section 1983 provides a cause of action for 'the deprivation of any rights, privileges or immunities secured by the Constitution and laws' of the United States." *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498 (1990) (quoting 42 U.S.C. § 1983). "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (cleaned up). To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

Plaintiff alleges three constitutional violations: (1) Jackson violated Plaintiff's Fourteenth

3

Amendment right under *Brady v. Maryland* because the state withheld material exculpatory evidence during the Barrett murder trial; (2) Jackson engaged in a malicious prosecution that violated Plaintiff's Fourth Amendment rights; and (3) Jackson fabricated evidence against Plaintiff in violation of his Fourteenth Amendment right to due process. Finally, Plaintiff alleges that the City and County of San Francisco are liable for failing to train SFPD and District Attorney employees regarding their obligations under *Brady*.

Jackson and the City move to dismiss each claim under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 27 at 6.) Under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facial plausibility standard is not a "probability requirement" but mandates "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). A complaint must contain more than "naked assertion[s]," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555–57. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Court addresses each claim in turn.

**I.     Brady Violation**

Plaintiff alleges that Jackson viewed the video in the District Attorney's office, believed that Anderson and Walker were the men in the video, and withheld this exculpatory evidence from Plaintiff. (Dkt. No. 26 ¶¶ 11, 44.) In *Brady v. Maryland,* the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). To state a claim under *Brady,* the plaintiff must allege that (1) the withheld evidence was favorable either because it was exculpatory or could be used to impeach, (2) the evidence was suppressed by the government, and (3) the nondisclosure prejudiced the plaintiff. *Strickler v. Greene,* 527 U.S. 263, 281–82 (1999). Further, individual officers may be held liable for *Brady* violations under Section 1983 if the officers act "with deliberate indifference to or reckless disregard for an accused's rights or for the truth in

4

withholding evidence from prosecutors." *Tennison v. City & Cty. of San Francisco,* 570 F.3d 1078, 1088 (9th Cir. 2009) (emphasis added).

Plaintiff has not adequately pled a Section 1983 *Brady* violation against Jackson. Drawing all reasonable inferences in Plaintiff's favor, because identification was the key issue at trial, Jackson's observations were exculpatory evidence and the failure to share that evidence with Plaintiff's defense team prejudiced Plaintiff. But Plaintiff has not alleged facts that support a plausible inference that Jackson suppressed this evidence—the second element of a *Brady* violation. Individual officers may be liable for their *Brady* violations under Section 1983 if the officers "withhold[] evidence from prosecutors." *Tennison*, 570 F.3d at 1088. Plaintiff does not allege any facts that suggest Jackson withheld information from the prosecutors.

To the contrary, drawing all reasonable inferences in Plaintiff's favor, the amended complaint can only support an inference that Jackson shared the exculpatory evidence with District Attorney investigators. (Dkt. No. 26 ¶¶ 8-11.) Plaintiff alleges Jackson learned of Walker and Anderson's potential involvement in the murder (the exculpatory evidence) when he viewed the video footage at a meeting *in the District Attorney's office with an investigator from that office.* (*Id.*) At that meeting, Jackson identified the other two perpetrators while viewing the video with the District Attorney investigators and his identification "was never disclosed by Jackson *or any investigators from the District Attorney's office.*" (*Id.*; *see also* Dkt. No. 26 ¶ 45) ("DOE District Attorney investigator in their investigative capacity *obtained* and then withheld exculpatory evidence from the Plaintiff.") (emphasis added).[2] These allegations do not support a plausible inference that Jackson withheld exculpatory evidence from prosecutors.

Plaintiff's argument that because Jackson never told the "prosecutor of the case," Jackson failed to meet his obligation under *Brady* (Dkt. No. 29 at 6) is incorrect. The legal standard is whether Jackson withheld evidence from "prosecutors." *Tennison,* 570 F.3d at 1088. Plaintiff cites no case, and the Court is not aware of any, that holds that an officer withholds exculpatory

---

[2] Defendants urge the Court to look at Plaintiff's initial complaint because Plaintiff initially pled different facts regarding Jackson's communication with the prosecution. (Dkt. No. 27 at 17.) Because the Court finds no *Brady* claim against Jackson in the amended complaint, the Court need not reach that issue.

information from the government when he discloses the information to District Attorney investigators investigating the crime at issue.

Further, Plaintiff does not allege any facts supporting a plausible inference that Jackson acted with deliberate indifference. *Tennison,* 570 F.3d at 1088. Plaintiff alleges that Jackson—who is not alleged to have been responsible for investigating the murder—was called to the District Attorney's office because of his familiarity with Western Addition gang members. At the meeting he was shown video of the incident and he disclosed his belief as to who the perpetrators in the video are. When called to testify during the federal proceedings he testified truthfully as to his observations of the video. These allegations do not support an inference of deliberate indifference. Thus, Plaintiff fails to state a Section 1983 *Brady* claim against Jackson.

## II. Malicious Prosecution

To state a malicious prosecution claim under Section 1983, a plaintiff must show that the defendant (1) prosecuted plaintiff (2) with malice; (3) without probable cause; and (4) with "the purpose of denying plaintiff equal protection or another constitutional right" *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 919 (9th Cir. 2012) (en banc) (quoting *Freeman v. City of Santa Ana,* 68 F.3d 1180, 1189 (9th Cir.1995)). A plaintiff alleging a Fourth Amendment violation must also show that the proceedings terminated in favor of the accused. *Id*. *See also Thompson v. Clark*, 142 S. Ct. 1332, 1341 (2022) (holding a plaintiff need only show that the criminal prosecution ended without a conviction).

As to Jackson, Plaintiff's claim fails at the first element. "Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination on the part of the prosecutor, and thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (citing *Smiddy v. Varney,* 665 F.2d 261, 266–68 (9th Cir. 1981)). However, the presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who "improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Id.*

6

1  (citing *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1126–27 (9th Cir. 2002)).

2  As discussed above, Plaintiff does not plausibly allege that Jackson concealed exculpatory evidence. Rather, as alleged, Jackson's sole involvement in the initial criminal case was the meeting at the District Attorney's office where he disclosed alternative suspects. (Dkt. No. 26 ¶¶ 8–11.) Thus, Plaintiff fails to state a claim for malicious prosecution against Jackson because the amended complaint does not allege that Jackson "engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Id*.

Plaintiff argues that Jackson's "observations were shared with the other Gang Task Force investigators. The investigators knew that the Plaintiff had not committ[ed] the crime. However, they continued to investigate into the Plaintiff being involved in the murder despite knowing that the Plaintiff was likely innocent due to the evidence in their possession." (Dkt. No. 28 at 9.) At best, that theory suggests the anonymous "investigators" engaged in a malicious prosecution. But Plaintiff's argument is not sufficient to state a claim against Jackson.

### III.  Fabrication of Evidence

Plaintiff's fabrication of evidence claim against Jackson fails for similar reasons. The Fourteenth Amendment prohibits the deliberate fabrication of evidence by a state official. *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (en banc). Deliberate fabrication can be established by circumstantial evidence. *Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir. 2017). "For example, evidence that officials continued their investigation of [a person] despite the fact that they knew or should have known that he was innocent, can raise the inference that the investigator has an unlawful motivation to frame an innocent person." *Id.* (cleaned up). Thus, the allegation that SFPD officers and District Attorney staff continued to investigate Plaintiff after Jackson identified alternative suspects could support a fabrication of evidence claim against those officers and staff members. But no allegation in the amended complaint supports a plausible inference that Jackson "continued" investigating Plaintiff because no allegation contends that Jackson ever investigated Plaintiff. Again, according to the amended complaint, Jackson's only involvement in Plaintiff's case was identifying other suspects—first at the meeting with the District Attorney investigator and then at the federal trial and post-conviction proceedings. (Dkt.

7

1   No. 26 ¶¶ 11, 21, 25–27.)  Thus, the claim against Jackson for fabrication of evidence fails

2   because he did not "continue[]" the investigation.  *Spencer v. Peters*, 857 F.3d at 793.

### IV. Municipal Liability

A local governmental unit may not be held responsible for the acts of its employees under a respondeat superior theory of liability.  *See Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).  "To [prevail on a claim against a municipal entity for a constitutional violation], a plaintiff must go beyond the respondeat superior theory of liability and demonstrate that the alleged constitutional deprivation was the product of a policy or custom of the local governmental unit."  *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 793 (9th Cir. 2016) (en banc).

A plaintiff may also establish municipal liability by demonstrating that the alleged constitutional violation was caused by a failure to train municipal employees adequately.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–91 (1989).  Such a showing depends on three elements:  (1) the training program must be inadequate "in relation to the tasks the particular officers must perform"; (2) the city officials must have been deliberately indifferent "to the rights of persons with whom the [local officials] come into contact"; and (3) the inadequacy of the training "must be shown to have 'actually caused' the constitutional deprivation at issue."  *Merritt v. Cty. of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989) (cleaned up).  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011)

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Connick*, 563 U.S. at 61 (cleaned up).  "Satisfying this standard requires proof that the municipality had actual or constructive notice that a particular omission in their training program will cause municipal employees to violate citizens' constitutional rights."  *Kirkpatrick*, 843 F.3d at 794 (cleaned up).  "[T]o demonstrate that the municipality was on notice of a constitutionally significant gap in its training, it is ordinarily necessary for a plaintiff to demonstrate a pattern of similar constitutional violations by untrained employees."  *Id.*  (internal quotations marks omitted).

Plaintiff alleges (1) the City failed to train its employees regarding *Brady* obligations, (Dkt.

8

1 No. 1 ¶ 67); (2) litigation finding SFPD committed *Brady* violations put the City on notice
2 regarding the risk of constitutional violations, (*id.* ¶ 69); and (3) the failure to train led to a
3 deprivation of Plaintiff's rights, (*id.* ¶ 68). Defendants challenge the second and third points.
4 (Dkt. No. 27 at 19.)

5 First, Defendants argue that Plaintiff has not alleged a "pattern of similar constitutional
6 violations of withholding exculpatory evidence as required to state a *Monell* claim." (*Id.*) The
7 Court disagrees. Plaintiff cites to *Tennison v. City & County of San Francisco,* 570 F.3d 1078 (9th
8 Cir. 2009) to show a pattern of *Brady* violations. (Dkt. No. 26 ¶ 67.) In *Tennison*, the Ninth
9 Circuit found two SFPD homicide inspectors withheld exculpatory evidence and violated the
10 plaintiffs' *Brady* rights. 570 F.3d at 1090–1095. The conduct in that case resembles the alleged
11 *Brady* violation here. For example, the homicide detectives in *Tennison* did not tell the prosecutor
12 that a witness identified alternative murder suspects. *Id.* at 1083. On that point, the Court held:

> Evidence that a person, known to the officers, has told the officers that they have arrested the wrong people, has identified the people involved, including the shooter, and described the cars and the chase in a manner consistent with the evidence, should not have been buried in a file, but should have been made known to the prosecutor.

17 *Id.* at 1090. Just as the inspectors in *Tennison* knew a credible witness identified alternative
18 suspects, Plaintiff alleges the District Attorney investigator here knew that an SFPD officer and
19 gang expert had identified alternative suspects. And, as in *Tennison*, Plaintiff contends the City
20 employees did not share the identification with the attorneys prosecuting the case. Thus, because
21 *Tennison* chastised the City for a pattern of behavior similar to the conduct at issue here, that case
22 put the City on notice that its employees were engaging in a pattern of *Brady* violations.[3] *Cf.*
23 *Connick*, 563 U.S. 51, 63 (2011) (holding plaintiff had not shown a pattern of *Brady* violations
24 because prior violations were dissimilar to the violation at issue).

---

[3] The Ninth Circuit filed its initial decision in *Tennison* on December 8, 2008—mere weeks after the Barrett murder and around the same time as the meeting at the District Attorney's office where Jackson identified Anderson and Walker. (Dkt. No. 1 ¶¶ 7–8.) *See Tennison v. City & Cnty. of San Francisco,* 548 F.3d 1293 (9th Cir. 2008). The Ninth Circuit amended its decision on June 23, 2009. *See Tennison*, 570 F.3d 1078. The amended decision, which reaches the same result as the initial decision, was published just weeks after SFPD arrested Heard. (Dkt. No. 1 ¶ 13.)

Second, Defendants argue Plaintiff has not pled a *Brady* violation so the City's alleged failure to train did not violate his rights. (Dkt. No. 27 at 19.) Again, the Court disagrees. While Plaintiff has not pled that Jackson violated *Brady*, the amended complaint does state a claim that a city employee violated *Brady*. For example, Plaintiff alleges that the "DOE District Attorney investigator" knew about Jackson's identification of alternative suspects and never shared that evidence with the prosecuting attorney. (Dkt. No. 1 ¶ 45.) Because identification was the key issue at trial (1) an SFPD gang expert's identification of alternative suspects was exculpatory evidence; (2) the DOE District Attorney investigator allegedly suppressed the evidence; and (3) Plaintiff suffered prejudice because of that suppression. *Strickler,* 527 U.S. at 281–82. Those allegations are sufficient to plead a *Brady* claim.

Thus, Plaintiff pled the elements for a *Monell* failure-to-train claim. Plaintiff alleges (1) that the City's training on *Brady* was inadequate; (2) that the City was deliberately indifferent to a pattern of constitutional violations; and (3) that the failure to train prejudiced Plaintiff. Thus, Defendants' motion to dismiss this claim is denied.

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' motion to dismiss the claims against Defendant Jackson without leave to amend. The record as to Defendant Jackson is well-developed from the earlier court proceedings and there are no facts that Plaintiff could in good faith allege to show that Jackson is individually liable. Defendants' motion to dismiss the *Monell* failure-to-train claim against the City is DENIED. A Case Management Conference is scheduled for July 28, 2022, at 2:30 p.m. via Zoom video. The parties' Joint Case Management Statement is due by July 21, 2022.

This Order disposes of Docket No. 27.

**IT IS SO ORDERED.**

Dated: June 30, 2022

JACQUELINE SCOTT CORLEY
United States District Judge