UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHARLES HEARD,

          Plaintiff,

     v.

DAMON JACKSON, et al.,

          Defendants.

Case No. 21-cv-09472-JSC

**ORDER RE: MOTION TO DISMISS CONVERTED TO MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 74

      Richard Barrett was shot twice in the back in San Francisco, California in November 2008. (Dkt. No. 74-4 at 9.)  Defendants Robert Lynch and Kevin Jones investigated the homicide for the San Francisco Police Department.  Defendants Damon Jackson, Reese Burrows and Sean Griffin—members of the SFPD Gang Task Force—allegedly identified suspects at a meeting in the District Attorney's office prior to Plaintiff's arrest.  Each of the individual defendants worked for the City and County of San Francisco (the "City") during the Barrett murder investigation. Eventually, Charles Heard ("Plaintiff") was arrested and convicted for participating in the murder.

      In 2020, Plaintiff's conviction was overturned based on the failure to disclose the identification of alternate suspects in 2008.  And in 2022, the California Court of Appeals found Plaintiff met his burden on a motion for factual innocence.  Plaintiff's lawsuit alleges the named defendants and the City violated his rights under the Fourteenth Amendment.

      Defendants moved to dismiss Plaintiff's second amended complaint ("SAC") and asked the Court to take judicial notice of various documents related to Plaintiff's prior criminal trial and post-conviction proceedings.  (Dkt. No. 74.)  Because Plaintiff requested an opportunity to submit contrary evidence, the Court converted the motion to dismiss to a motion for summary judgment and allowed Plaintiff leave to file material "pertinent to the motion."  Fed. R. Civ. P. 12(d).  After considering the papers submitted—including Plaintiff's supplementary filing and Defendants reply—and conducting oral argument on August 3, 2023, the Court GRANTS in part and DENIES in part the motion for summary judgment.

1

**BACKGROUND**

2

**I.      Factual Background**

3

    **A.      Francis Smith**

4

    The primary witness against Plaintiff at trial was Francis Smith.  Smith was a tourist from

5

Texas.  She saw the murder while smoking outside a bar in North Beach, San Francisco.

6

**a.      The Texas Identification**

7

    A Texas law enforcement official, Paul Brinkley, conducted a photo lineup with Smith

8

roughly six weeks later at her home.  (Dkt. No. 74-8 at 5.)  Brinkley read Smith instructions from

9

a preprinted form.  (Dkt. No. 74-8 at 7.)  Those instructions stated:

10

> The person or persons who committed the crime may or may not be

11

> in the group of photographs.  You are not obligated to identify anyone.
> Study each photograph carefully before you make any comments.

12

> Consider that the Photographs could be old or new.   Hairstyles
> change. Persons can alter their identity by growing or shaving facial

13

> hair.  Persons gain or lose weight. Skin color can be lighter or darker
> due to the photographic process.

14

(Dkt. No. 74-8 at 7-8.)  Brinkley then showed Smith two groups of photos.  (*Id.*)  Smith did not

15

identify anyone in the first group of photos.  (*Id.*)  She then identified Heard in the second group

16

of photos.  (*Id.* at 9.)  Brinkley testified to the same set of events at the trial. (*Id.* at 18.)

17

**b.      The Phone Call with Lynch**

18

    Lynch called Smith after the photo lineup.  (Dkt. No. 102-6 at 3.) According to a transcript

19

labeled "Police Incident Report No: 081 260 663," Lynch asked Smith how Brinkley conducted

20

the photo lineup.[1]  (*Id.* at 3-4.)  The exchange is then transcribed as follows:

21

    Q: And so the guy that you recognized.

22

    A: Yes sir.

23

    Q: What did he do?

24

    A: Ah, he was the one that I recognized as being the shooter.

25

    Q: Okay.

26

    A: Um, I wasn't a hundred percent sure.

27

_____

28

[1] Plaintiff presents evidence of this conversation via a transcript. (Dkt. No. 102-6 at 3.)
Defendants object to the transcript's authenticity.

United States District Court
Northern District of California

Q: Um hmm.

A: But um, you know, I would be a lot more certain if I had a little bit more information about him I guess, um, like whether he had a gold tooth or a gold cap on his tooth.

Q: What difference would that make?

A: Well cause I remember seeing you know, not necessarily a solid gold tooth but I guess it's a crown or a cap or something on one of his front teeth.   And then in the picture, his mouth was closed so I couldn't really see that.  But um, other than that, I mean it—it looks a lot like him.  I mean going off of an image I saw for a few seconds a few months ago, so—

Q: Right.

A: It's kinda hard to say I'm a hundred percent sure.

Q: Right.

A: But ah, he did look familiar so.

[. . .]

Q: As your – okay. So let me see if I have this right.  He showed you a first group of photos.

A: Um hmm.

Q: And you didn't recognize anybody.

A: No.

Q: And then he showed you a second group of photos and you recognized someone that you ah, thought looked like the shooter—

A: Yes Sir.

Q: And the um, only difference is the guy's mouth – well not—maybe not the only difference but something –one of the differences or a difference is –

A: Um hmm.

Q: In the photograph he had his mouth closed and you remember the shooter having a gold cap or a gold – gold crown on his front teeth.

A: Yes sir. Yes, that's a fact. Also I mean it's kind of a minor detail but in the picture his hair looked shorter so I'm – I'm guessing that he probably got a haircut.

(Dkt. No. 102-6.)

United States District Court
Northern District of California

United States District Court
Northern District of California

### B.     The Warrant

In July 2009, roughly eight months after the shooting, Lynch obtained arrested Plaintiff and charged him with Barrett's murder. (Dkt. No. 74-4 at 4-8.)  Lynch provided an affidavit to support the warrant.  (*Id.* at 9.)  The affidavit explains Lynch and Jones were assigned to the homicide in November 2008.  (*Id.*)  Witnesses saw two suspects fleeing the scene.  (*Id.*)

Six witness statements are included in the affidavit.  According to Lynch, "Witness #1" described the shooter as a "Latin male, approximately 5' 8", heavy build, hair slicked back in a pony tail, wearing a red shirt." (*Id.*)  "Witness #2" described the shooter as a "black male … 20s to 30s in age, medium build, looked fit, short hair, dark skin, facial hair (couple day's growth), snapped brim hate, black white gray, and shirt, black over shirt, white sneakers."  (*Id.*)  "Witness #3" said the man with a gun was "black, 30s 5'-10" to 6' 1", fat, black shirt with graffiti pants, short hair." (*Id.*) Witnesses 1, 2, and 3, did not give a description of the other suspect.  (*Id.*) "Witness #4" was "about one foot away" from the shooter and described him as a "black male." (*Id.* at 10.)  "Witness #5" described two men, one was "Black 19 to 24 years old, wearing a white hoodie, with a colored pattern. Taller than Suspect #2. Motioned like he had a gun but wit #5 never saw a gun." (*Id.*)  The other man was described as "Black, 19 to 24 years, black hoodie, shorter than suspect #1."  Finally, Witness #6 described the man with the gun as "black, 5'-10" to 6' 0" medium build, wearing a black nylon jacket." (*Id.*)

Lynch also reviewed surveillance footage from a nearby office building taken around the time of the shooting.  Two men are visible in the footage.  One was wearing a dark colored hoodie and the other was wearing a light-colored hoodie.  (*Id.*)  One of the men is wearing a "pair of pants with a stich design of a horseshoe pattern on the rear two pockets."  (*Id.*)

Lynch averred Sergeant Reese Burrows—a member of the SFPD Gang Task Force—told him an informant identified "Cheesy" as the shooter.  (*Id.*)  Burrows explained "Cheesy" is an alias for Charles Heard.  (*Id.*)  According to the affidavit, Witness #2 "viewed a photo line-up containing a mug shot photo of Charles Heard and five fillers.  Wit #2 identified Heard as the shooter.  Wit #2 said that they would be a lot more certain if he/she could see the man's, (Heard's) teeth because the shooter had a gold crown or cap of one of his front teeth and the man in the

1   photo had his mouth closed." (*Id.* at 11.) Witness #3 did not identify Heard in photo array.  (*Id.*)

2   Witness #4 identified two other photos as possible shooters.  (*Id.*)  Witness #5 identified Heard as

3   the non-shooter suspect.  (*Id.*)  Witness #6 did not identify anyone in the array.  (*Id.*)

4     Finally, Lynch explains heard was arrested for robbery in December 2008.  Burrows—the

5   arresting officer—indicated Heard was wearing "a pair of jeans with stitching in the shape of

6   horseshoes on the rear pockets." (*Id.* at 11.)  Lynch looked up cellphone data for the phone Heard

7   was carrying during that December arrest.  (*Id.*)  The cellphone data indicated cell-tower

8   information that allegedly corresponded with geographic events near the murder and eventual

9   getaway.  (*Id.*)

10     **C.  The Preliminary Hearing & Trial**

11     At the preliminary hearing, Heard's counsel challenged the identification.  (Dkt. No. 74-5

12   at 5.)  Specifically, counsel noted "four witnesses who said it wasn't him, who didn't make the

13   identification." (*Id.*)  When Smith testified, she remembered a "gold crown, gold cap on one of

14   [the shooter's] teeth." (*Id.* at 7.)  Heard's counsel cross examined her on this point because Heard

15   had a "grill" such that his "whole mouth [was] filled with gold." (*Id.* at 11.)  Heard's counsel

16   asked Smith if understood the difference and Smith indicated the suspect did not have a grill as far

17   as she could tell.  (*Id.*)  The Court determined there was probable cause and held Heard to answer.

18     At the jury trial, Smith testified again.  (Dkt. No. 74-8 at 5.)  She identified Heard in court.

19   (*Id.* at 12.)  Heard's counsel cross-examined Smith on the tooth-grill inconsistency and the

20   inconsistency between her description of the suspect's clothing and the video evidence.  (*Id.* at 13-

21   14.)  Smith explained "It's because his mouth wasn't open all the way. It's kind of how he's been

22   sitting here in the courtroom today. His upper lip shows just a couple of his front teeth. And, of

23   course, there was light reflecting off of it because there was light everywhere and you see a gleam

24   from it.  I didn't have an opportunity to count his teeth. But I knew for a fact that there was at least

25   one." (*Id.*)  Based on the inconsistencies in Smith's statements, Heard's counsel moved to admit

26   photos of an alternative suspect—Dennis Anderson. (Dkt. No. 74-11 at 12.) The trial court

27   rejected that motion because "there's no comment by any of the eyewitnesses that Dennis

28   Anderson could possibly be the shooter. They're emphatic in their rejection." (*Id.* at 14.)

United States District Court
Northern District of California

United States District Court
Northern District of California

The jury convicted Heard for murder and attempted robbery but found "not true" the allegations that Heard personally used or possessed a firearm.  (Dkt. No. 102-5 at 3-4.)  He was given a sentence of 25 years to life.  (*Id.*)  The conviction was upheld on appeal in 2012.  (*Id.*)

### D.      Federal RICO Trial

Two years later, the United States brought federal RICO charges against Heard.  His participation in the Barrett murder was alleged as a predicate offense under RICO.

At the federal trial in 2018, Damon Jackson testified as the government's gang-expert.  He explained he had known Heard for years.  (Dkt. No. 74-13 at 5.)  He had also known two other men: Dennis Anderson and Gregory Walker.  (*Id.*)  Jackson was then shown the video evidence from the Barrett murder.  (*Id.* at 6.)  Jackson identified the men in the surveillance video as Anderson and Walker.  (*Id.*)  Heard was convicted under 18 U.S.C. 1962(d) based on other predicate offenses, but not the Barrett murder.  (Dkt. No. 74-14 at 2.)

### E.      Habeas and Actual Innocence

Based on Jackson's testimony at the RICO trial, Heard petitioned for habeas corpus as to the Barrett murder.  Jackson testified again at the habeas hearing in state court in 2020.  (Dkt. No. 74-15.)  Jackson explained that he watched the surveillance video from the Barrett murder for the first time in 2008 at the District Attorney's office.  (*Id.* at 4.)  He testified the quality of the video appeared better when he watched the video in 2018 than what he remembered from 2008.  (*Id.*)  The first exchange went as follows:

> Q. And if you had been certain back in 2008 when you had viewed that Montgomery Street surveillance video you would have provided that information to the prosecutor, the inspector in charge of the case and the defense, correct?
>
> A. When we were watching the video in the District Attorney's office, if we all had positive identifications it would have been provided at that moment.
>
> Q. Okay. But that did not occur?
>
> A. Not to my knowledge. It didn't come from me. Unless it came from somebody else, I wouldn't know.
>
> Q. You did not make a positive identification back in 2008?
>
> A. No.

(Dkt. No. 74-15 at 5.)  After cross-examination, the Court intervened and questioned Jackson again regarding this meeting:

> The Court: And can you estimate about how many people were huddled around looking at the video?
>
> The Witness: Four, five, maybe.
>
> The Court: Now, when you were answering, I think it was the prosecutor's questions, you said that as you watched it people were saying "I think that's – I think that's --" but you just said it like that. Were people saying names, "I think that's X, I think that's Y"?
>
> The Witness: Yes, Your Honor.  The individuals who we believed it could have been between Charles Heard, Dennis Anderson, and Gregory Walker.
>
> […]
>
> The Court: But would it – you do remember there was a representative of the DA's office there?
>
> The Witness: I couldn't tell you. I mean, obviously, someone asked us to come down and view it and provided us with the evidence but I couldn't tell you who.

(*Id.* at 7-8.)  Jackson believed an assistant district attorney assigned to homicide may have been there but claimed "it definitely was not" a district attorney investigator.[2]  At argument, the court summarized: "Counsel, a meeting in the District Attorney's office with an attorney from the District Attorney's office present. That's the factual record." (Dkt. No. 74-16 at 4.)  Heard's counsel responded "Correct." (*Id.*)

A cognitive science expert, Dr. Kathy Pezdek, also testified on Plaintiff's behalf at the habeas proceeding.  (Dkt. No. 102-4.)  She testified to the unreliability of Smith's identification for a number of reasons, including possible "contamination" of Smith's memory during the Lynch-Smith phone call. (*Id.* at 21.)  Specifically, she noted that Lynch's use of the word "teeth" may have influenced Smith's memory of a gold-tooth, undermining the reliability of Smith's memory.  (*Id.*)

Based largely on Jackson's testimony, the state court granted habeas relief.  The court

---

[2] Plaintiff's second amended complaint implied the person in the room was a district attorney investigator. (*See* Dkt. No. 31.)

stated:

> I believe that the Petitioner has carried it's burden on the *Brady* claims. My confidence in the outcome of the trial has been significantly undermined by the failure to disclose Sergeant Jackson's opinion about who was depicted on that video taken on Montgomery Street just before the homicide occurred. Some of my questions of counsel during argument sheds light on my conclusion.
>
> [. . .]
>
> I think the notion that multiple members of the San Francisco Police Department questioned whether or not Charles Heard was depicted in the video at a time prior to his arrest, prior to the preliminary hearing, in the presence of the prosecutor and this was not disclosed to the defense is very troubling to me and I think it's plainly a *Brady* violation.

(Dkt. No. 74-16 at 6-7.) The District Attorney declined to re-try the case and the case was dismissed. (Dkt. No. 102-5 at 5.) Plaintiff moved for a declaration of factual innocence. The Superior Court denied that motion. The Court of Appeals reversed and found Plaintiff had met his burden to prove factual innocence. *People v. Heard*, 2022 WL 4493395 at *12 (Cal. Ct. App. Sept. 28. 2022). That decision made Plaintiff eligible for compensation from the state. *Id.* at *8 n.7.

## II.      Subsequent Procedural Background

Plaintiff brought this suit against Sergeant Jackson under 42 U.S.C. § 1983 for malicious prosecution, violations of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and fabrication of evidence. He also sued the City for failing to train its employees regarding their obligations under *Brady*. The Court dismissed the allegations against Sergeant Jackson because—based on the allegations in the second amended complaint—Jackson had told some employee at the District Attorney's office about his identification in 2008. (*See* Dkt. No. 31.) But the Court allowed the municipal allegations to proceed, on the theory that the City may have been deliberately indifferent to non-attorney's *Brady* obligations. (*Id.*) Specifically, the allegations implied a District Attorney investigator may have been present at the 2008 meeting when Jackson identified Heard, Walker, and Anderson as possible suspects. (*Id.*)

At Jackson's deposition in this matter, the following exchange occurred:

> Q: [W]hen you were at this meeting, and whatever information that you gathered by watching the video, you never conveyed this information, you personally, to any members of the district attorney's

office; correct?

[. . .]

A: I didn't gain any information of watching the video, so there was no information to give to the district attorney, other than I could not identify anybody in the video.

[. . .]

Q: Okay. So I'll – I'll state to you that Judge Moody asked, quote: "Now, when you were answering – I think it was the prosecutor's questions, you said that, as you watched it, people were saying 'I think that's…,' 'I think that's…' but you just said it like that. Many people saying names, 'I think that's X, I think that's Y.'?" Does that sound familiar to you?

A: Yes.

Q: Okay. And your answer was, quote: "Yes, Your Honor. The individuals who we believe it could have been were between Charles heard, Dennis Anderson and Gregory Walker."  Do you – Do you recall saying that to the judge?

A: I don't recall it, no.

Q: Do you disagree that you made that statement?

[. . .]

A: No.

Q: Okay. So if you told the judge that it could have been between Charles Heard, Gregory Anderson, and – excuse me – Charles Heard, Anderson, and Walker, then that's – that's correct information; correct?

A: Yes.

Q: And you testified earlier that you never conveyed this information to – you don't recall conveying this information to any members of the District Attorney's office; correct?

[. . .]

A: I do not.

Q: Do you recall relaying this information to anyone, other than Mr. Burrows and Mr. Griffin, that it could have been Charles Heard, Dennis Anderson, or it could have been Gregory Walker?

[. . .]

A: Did I convey that to anybody? I did not. We were unable to make an identification, and it's not my normal practice to throw names out there without a positive identification because I don't know where the

investigator is with the case.

(Dkt. No. 74-2 at 6-8.)  Based on Jackson's deposition testimony, Plaintiff moved for reconsideration of this Court's order dismissing the complaint against Jackson.  The Court granted Plaintiff leave to amend the complaint.

Plaintiff's second amended complaint brings claims against three sets of defendants.  First, Defendant sues Jackson, Burrows, and Griffin for *Brady* violations for failing to disclose the alleged identification in the 2008 meeting.  Second, Defendant sues Lynch and his partner Jones for malicious prosecution, fabrication of evidence, and stand-alone "suggestive identification" due process claim.[3]  Finally, Plaintiff again brings his municipal allegations against the City.

### DISCUSSION

The Court first addresses the *Brady* claims against Jackson, Burrows, and Griffin stemming from the 2008 meeting.  Next, the Court addresses the claims against Lynch and Jones regarding the investigation itself.  Finally, the Court turns to the municipal allegations.

### I.    Jackson, Burrows, and Griffin

Plaintiff alleges Jackson, Burrows, and Griffin observed video footage of the suspects in 2008, they "observed" the assailants could have been Dennis Anderson and Gregory Walker, and they never told any member of the San Francisco District Attorney's Office this information.

Under *Brady*, Plaintiff must prove (1) the withheld evidence was favorable either because it was exculpatory or could be used to impeach, (2) the evidence was suppressed by the government, and (3) the nondisclosure prejudiced the plaintiff.  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  Individual officers may be held liable for *Brady* violations under Section 1983 if the officers act "with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1088 (9th Cir. 2009).  Because disputed questions of material fact exist regarding Plaintiff's *Brady* claim against the individual officers, Defendants' motion for summary judgment is DENIED.

---

[3] Plaintiff has abandoned a *Brady* claim against Lynch and Jones.  The SAC also references the Fourth Amendment.  However, Plaintiff appears not to be pursuing any such claims.

United States District Court
Northern District of California

1

### A.    Judicial Estoppel.

Defendants' first argument is that Plaintiff should be judicially estopped from arguing a District Attorney employee was not present in the meeting when Defendants made the alleged identification.  As the Ninth Circuit recently explained:

> Judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment" and prevents "the perception that either the first or the second court was misled." We find a party is estopped from making an argument when 1) its current position is "clearly inconsistent" with its previous position; 2) "the party has succeeded in persuading a court to accept that party's earlier position"; and 3) the party, if not estopped, "would derive an unfair advantage or impose an unfair detriment on the opposing party."

*Perez v. Discover Bank*, No. 22-15322, 2023 WL 4697253, at *3 (9th Cir. July 24, 2023) (cleaned up).  Defendants contend: (1) Plaintiff's current position—that a District Attorney's office employee was not present during the 2008 meeting—is inconsistent with Plaintiff's position during habeas and innocence proceedings, (2) Plaintiff convinced the trial and appellate courts a District Attorney was present in the habeas and innocence proceedings, and (3) Plaintiff's new position would give Plaintiff an unfair advantage.  (Dkt. No. 104 at 9-11.)  In short, Defendants allege this advantage exists because his prior position (that a district attorney was present) led to monetary compensation in innocence proceedings, but that same position would not yield compensation here. (*Id.*)  Defendants "are not asking the Court to decide what happened at the alleged meeting but rather to review what Plaintiff argued in his habeas case and estop him from making an inconsistent argument here to obtain a double recovery." (*Id.*)

This argument is unpersuasive.  Plaintiff would not gain an *unfair* advantage pursuing a theory based on Jackson's new testimony.  "A party derives an unfair advantage from taking two contradictory positions if invoking the new position creates the 'possibility of [the party] prevailing on the very position it successfully discredited." *Perez*, 2023 WL 4697253, at *4 (quoting *United Nat. Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 779-80 (9th Cir. 2009)). Plaintiff never "discredited" the notion that a District Attorney was not present in the 2008 meeting during habeas proceedings.  A *Brady* violation could have occurred whether an attorney was present or not.  *Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1088 (9th Cir.

2009) (finding liability based on police officers' *Brady* obligations). The crux of Plaintiff's position in the state proceedings was the suppression of exculpatory information, not the identity of the suppressor. Moreover, Defendants' motion overlooks that Jackson—not Plaintiff—is the one changing his story. Jackson originally testified a District Attorney employee was present when he speculated about the identification. (74-15 at 8 ("I mean, obviously, someone asked us to come down and view it and provided us with the evidence, but I couldn't tell you who.") But then *Jackson* changed his testimony during this litigation. (Dkt. No. 74-2 at 6-8.) ("Did I convey that to anybody? I did not.") Plaintiff cannot be faulted for initially relying on Jackson's testimony in the habeas proceedings—Jackson was at the meeting, Plaintiff was not. It is not unfair for Plaintiff to proceed against Jackson in order to determine what really happened.

In sum, because Plaintiff's advantage in pursuing Jackson's new story would not be an *unfair* advantage, judicial estoppel is not appropriate here.

## B.    Materiality

Defendants' alternative argument is Jackson's identification was immaterial given the other strong evidence against Heard. Defendants argue the prosecutor relied on the video evidence Jackson viewed solely to state the video evidence did not exclude Plaintiff as a suspect. (Dkt. No. 104 at 15.) The Court disagrees. To take just a few examples of materiality supported by drawing reasonable inferences from the record in Heard's favor, that the San Francisco Gang Task Force members identified alternative suspects could have been used to further impeach Smith's shaky eye-witness testimony. And, as discussed above, Heard's counsel moved to introduce Anderson's photo but was not allowed to do so. With Jackson's testimony regarding the 2008 meeting, that decision could have been different. Finally, had Jackson testified to his impressions of the video, jurors could have found reasonable doubt Heard was present at the scene all. In sum, Defendants ask the Court to make inferences from that evidence in Defendants' favor. The Court cannot do so on summary judgment.

## C.    Burrows and Griffin

Finally, Defendants Burrows and Griffin argue the evidence does not include any facts supporting an inference they could be liable for the *Brady* violation. The Court disagrees.

1    Reading Jackson's deposition in the light most favorable to Heard, as this Court must, Jackson

2    suggests Burrows and Griffin were present during the disputed meeting and may have also known

3    about the alternative suspect identification. (Dkt. No. 74-2 at 6-8.)  Jackson's testimony also

4    supports a finding Burrows and Griffin did not disclose their identification to any district attorney

5    employee.  Burrows and Griffin do not offer any testimony disputing these inferences, let alone

6    rendering them unreasonable.  Because genuine disputes remain, the claims against those officers

7    may proceed.

8    **II.      Lynch and Jones**

9           Heard presents a number of new claims in the SAC against the lead investigators in the

10   murder case—Lynch and Jones.  As an initial matter, no evidence in the record refers to Jones.

11   Thus, Defendants' motion for summary judgment on the claims against Jones is GRANTED.  As

12   to Lynch, Heard brings three claims under 42 U.S.C. § 1983: (1) a malicious prosecution claim,

13   (2) a claim for fabrication of evidence, and (3) a "suggestive identification" due process claim.

14   These claims largely focus on Lynch's phone call with Smith, during which he repeated Smith's

15   description of the shooter as having gold "teeth" rather than a single gold "tooth."

16          A.      **Malicious Prosecution**

17          To prevail on his malicious prosecution claim, Plaintiff must prove "that the prior action

18   (1) was commenced by or at the direction of the defendant and was pursued to a legal termination

19   in his, plaintiff's, favor; (2) was brought without probable cause; and (3) was initiated with

20   malice." *Mills v. City of Covina*, 921 F.3d 1161, 1169 (9th Cir. 2019) (cleaned up; quoting

21   *Sheldon Appel Co. v. Albert & Oliker*, 765 P.2d 498, 501 (Cal. 1989)); *see also id.* ("Federal

22   courts rely on state common law for elements of malicious prosecution.").

23          In California, as in virtually every other jurisdiction, it is a long-standing principle of

24   common law that a decision by a judge or magistrate to hold a defendant to answer after a

25   preliminary hearing constitutes *prima facie*—but not *conclusive*—evidence of probable cause.

26   *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004).  "A plaintiff can rebut a *prima*

27   *facie* finding of probable cause is by showing that the criminal prosecution was induced by fraud,

28   corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *Id.*

United States District Court
Northern District of California

13

1    Moreover, "[o]rdinarily, the decision to file a criminal complaint is presumed to result from an

2    independent determination on the part of the prosecutor, and thus, precludes liability for those who

3    participated in the investigation or filed a report that resulted in the initiation of proceedings." *Id.*

4    However, the presumption of prosecutorial independence does not bar a subsequent § 1983 claim

5    against state or local officials who improperly exerted pressure on the prosecutor, knowingly

6    provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in

7    wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal

8    proceedings. *Id.*

9         Heard rebuts neither the prima facie finding of probable cause nor presumption of

10   prosecutorial independence.  He argues Lynch's "reckless and wrongful conduct" regarding "the

11   impermissibly suggestive identifications made by Francis [Smith] as described above is more than

12   enough to rebut the presumption of probable cause." (Dkt. No. 99 at 26.)  Not so.  It is undisputed

13   Smith identified Heard in the photo array before speaking with Lynch.  Lynch included both

14   Smith's uncertainty regarding the identification and her description of a single gold tooth rather

15   than multiple "teeth" in his affidavit.  (Dkt. No. 74-4 at 11.)  The prosecution was based on that

16   record information.  And Smith was cross-examined in detail regarding the tooth-grill discrepancy

17   during the preliminary hearing.  (Dkt. No. 74-8 at 5.)  Upon review of the record, the evidence can

18   only support a finding that the independent judgment of prosecutor disrupts proximate causation

19   here.[4]  Thus, Lynch's motion for summary judgment on the malicious prosecution claim is

20   GRANTED.

21        **B.    Evidence Fabrication**

22        Heard next submits Lynch fabricated Smith's identification evidence by saying "teeth"

23   instead of using Smith's singular reference to a gold "tooth" when speaking with her.  According

24   to Plaintiff, this contamination constitutes deliberate fabrication because Lynch knew Heard had a

25   grill and wanted to shore up Smith's identification by changing her memory.

26

27   _____

28   [4] Moreover, Lynch's affidavit did not omit the ample exculpatory evidence—including five other
     witnesses, four of whom did not identify Plaintiff as the shooter.  Plaintiff offers no argument to
     rebut Lynch's forthright affidavit.

United States District Court
Northern District of California

The Fourteenth Amendment prohibits the deliberate fabrication of evidence by a state official. *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (en banc). To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty. *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). An evidence fabrication claim requires more than just continuing an investigation or suppressing exculpatory evidence. *Devereaux*, 263 F.3d at 1079. Otherwise, evidence fabrication claims would subsume claims for malicious prosecution or *Brady* violations. "Deliberate fabrication, in other words, must mean something more than a mere omission." *O'Doan v. Sanford*, 991 F.3d 1027, 1045 (9th Cir. 2021).

Plaintiff's evidence is insufficient to support a finding of fabrication here. *See Spencer*, 857 F.3d at 793 (describing direct evidence as "an interviewer … deliberately mischaracterize[ing] witness statements in her investigative report.") Plaintiff asks the Court to speculate that Lynch acted deliberately because he knew Plaintiff had a grill. But, as noted above, Lynch accurately characterized Smith's identification of one gold tooth in his affidavit for the arrest warrant. (Dkt. No. 74-4 at 11.) Plaintiff cites no case finding deliberate fabrication based on an officer's casual repetition of the witness's wording in an interview conversation—let alone a case in which the officer subsequently reported the testimony accurately in an affidavit.[5] *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003) ("While Perez's affidavit may have been careless or inaccurate, it does not satisfy *Devereaux's* stringent test.")

Even if the Court assumes Lynch's usage of "teeth" did change Smith's perception and her later testimony at trial such that the evidence was unreliable, Plaintiff must prove facts to support his claim Lynch's behavior was "deliberate." Deliberate fabrication can be established by circumstantial evidence. *Spencer*, 857 F.3d at 793. To support a deliberate fabrication of evidence claim via circumstantial evidence, Plaintiff "must, at a minimum, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their

---

[5] Indeed, as Plaintiff admitted at oral argument, qualified immunity would almost certainly apply under these circumstances in light of the absence of clearly established law prohibiting this behavior.

1    investigation of [Plaintiff] despite the fact that they knew or should have known that he was

2    innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that

3    they knew or should have known that those techniques would yield false information." *O'Doan*,

4    991 F.3d at 1076.  The evidence does not support an inference Lynch knew or should have known

5    Heard was innocent because (1) Smith identified Heard outside of Lynch's presence *before* the

6    teeth-tooth conversation, and (2) Lynch accurately reported Smith's testimony in the affidavit after

7    that conversation.  Moreover, Plaintiff cites no case finding an officer's use of a slightly different

8    word during an interrogation constitutes an investigative technique that was "so coercive and

9    abusive" it is likely to yield false information.  *See Carrillo v. Cnty. of Los Angeles*, 798 F.3d

10    1210, 1227 (9th Cir. 2015) (officers told witness his initial identification "could not be the suspect

11    shooter" then affirmed he made the "right choice" after the witness ultimately selected the

12    plaintiff).  Rather, Plaintiff argued at the hearing his motion was based on the idea that Lynch

13    "should have known better."  But "[s]urmise, conjecture, theory, speculation and an advocate's

14    suppositions cannot 'do duty for probative facts' and valid inferences." *McSherry v. City of Long*

15    *Beach*, 584 F.3d 1129, 1136 (9th Cir. 2009).

16        Because Plaintiff fails to provide evidence sufficient to support a vital element of the

17    claim, the Court GRANTS Lynch's motion for summary judgment on the evidence fabrication

18    claim.

19            **C.    Suggestive Identification Due Process Claim**

20        Plaintiff cites a habeas case, *Neil v. Biggers*, 409 U.S. 188 (1972), and a criminal case,

21    *United States v. Montgomery*, 150 F.3d 983 (9th Cir. 1998) for the proposition that Lynch can be

22    liable for a due process violation under § 1983 if Lynch used suggestive identification procedures.

23    Plaintiff cites no case finding civil liability under circumstances similar to those alleged here.  Nor

24    has the Court found such a case upon its own investigation.  *But see McSherry v. City of Long*

25    *Beach*, 584 F.3d 1129, 1136 (9th Cir. 2009) (rejecting a due process claim for use of an

26    "improper, unreliable and suggestive identification procedure" on factual, rather than legal

27    grounds).

28        To the extent a stand-alone due process claim for suggestive identification practices is

United States District Court
Northern District of California

16

1    actionable under § 1983, the harm stemming from the identification procedure overlaps entirely

2    with Plaintiff's *Deveraux* fabrication claim in practice.  *See Carrillo v. Cnty. of Los Angeles*, No.

3    2-11-CV-10310-SVW-AGR, 2012 WL 12850128, at *5 n.5 (C.D. Cal. Nov. 14, 2012), *aff'd*, 798

4    F.3d 1210 (9th Cir. 2015).  As the district court explained in *Carrillo*,

> Unconstitutionally suggestive identification techniques are those that are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [] By definition, such techniques appear to be "so coercive and abusive" that officers know or should know that they yield false information. Whether unconstitutionally suggestive identification techniques state a claim under *Devereaux*'s fabrication-of-the-evidence test or as due process violations matters little to Plaintiff's claim: either way, the use of such techniques to procure a conviction violates the requirements of due process.

11   *Id.* (cleaned up).  The same is true here.  Thus, Plaintiff's due process claim based on suggestive

12   interrogation techniques fails for the same reason as the *Devereaux* evidence fabrication claim.

### III.    The City

14       Plaintiff's final claim is against the City for failing to train officers regarding their

15   obligations under *Brady v. Maryland*.   "To [prevail on a claim against a municipal entity for a

16   constitutional violation], a plaintiff must go beyond the respondeat superior theory of liability and

17   demonstrate that the alleged constitutional deprivation was the product of a policy or custom of

18   the local governmental unit." *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 793 (9th Cir. 2016) (en

19   banc).  A plaintiff may also establish municipal liability by demonstrating that the alleged

20   constitutional violation was caused by a failure to train municipal employees adequately. *See City

21   of Canton, Ohio v. Harris*, 489 U.S. 378, 388–91 (1989). Such a showing depends on three

22   elements: (1) the training program must be inadequate "in relation to the tasks the particular

23   officers must perform"; (2) the city officials must have been deliberately indifferent "to the rights

24   of persons with whom the [local officials] come into contact"; and (3) the inadequacy of the

25   training "must be shown to have 'actually caused' the constitutional deprivation at issue." *Merritt

26   v. Cty. of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989) (cleaned up). "A municipality's

27   culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to

28   train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011)

1    "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal

2    actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at

3    61 (cleaned up). "Satisfying this standard requires proof that the municipality had actual or

4    constructive notice that a particular omission in their training program will cause municipal

5    employees to violate citizens' constitutional rights." *Kirkpatrick*, 843 F.3d at 794 (cleaned up).

6    "[T]o demonstrate that the municipality was on notice of a constitutionally significant gap in its

7    training, it is ordinarily necessary for a plaintiff to demonstrate a pattern of similar constitutional

8    violations by untrained employees." *Id.* (cleaned up).

9        Defendants challenge only whether Plaintiff can establish deliberate indifference to a

10   pattern of constitutional violations here.  (Dkt. No. 104 at 19-20.)  As at the motion to dismiss

11   stage, Plaintiff relies solely on *Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1091

12   (9th Cir. 2009) to meet the notice requirement.  As the Court explained there:

13

14          In *Tennison*, the Ninth Circuit found two SFPD homicide inspectors
            withheld exculpatory evidence and violated the
15          plaintiffs' *Brady* rights. 570 F.3d at 1090–1095.  The conduct in that
            case resembles the alleged *Brady* violation here. For example, the
16          homicide detectives in *Tennison* did not tell the prosecutor that a
            witness identified alternative murder suspects. *Id.* at 1083. On that
17          point, the court held:

18          "Evidence that a person, known to the officers, has told the officers
            that they have arrested the wrong people, has identified the people
19          involved, including the shooter, and described the cars and the chase
            in a manner consistent with the evidence, should not have been buried
20          in a file, but should have been made known to the prosecutor."

21          *Id.* at 1090. Just as the inspectors in *Tennison* knew a credible witness
            identified alternative suspects, Plaintiff alleges the District Attorney
22          investigator here knew that an SFPD officer and gang expert had
            identified alternative suspects. And, as in *Tennison*, Plaintiff contends
23          the City employees did not share the identification with the attorneys
            prosecuting the case.

24   *Heard v. Jackson*, No. 21-CV-09472-JSC, 2022 WL 2356821, at *6 (N.D. Cal. June 30, 2022).

25   Defendants object that one decision, handed down roughly contemporaneously within the events

26   here, cannot constitute adequate notice to the City.   (Dkt. No. 104 at 20.)

27        The Court disagrees.  *Tennison* was a major case that described a series of separate,

28   significant *Brady* violations.  *Tennison*, 570 F.3d at 1086.  The Ninth Circuit filed its initial

United States District Court
Northern District of California

1    decision in *Tennison* on December 8, 2008—just weeks after the Barrett murder. *See Tennison v.*

2    *City & Cnty. of San Francisco*, 548 F.3d 1293 (9th Cir. 2008).[6]

3          Defendants' citation to *Hyde v. City of Willcox*, 23 F.4th 863, 874-75 (9th Cir. 2022) is

4    inapposite.  Defendants quote *Hyde* for the proposition that "an inadequate training policy itself

5    cannot be inferred from a single incident." (Dkt. No. 104-20.)   But the full quotation from Hyde

6    reveals Defendants' error:

7              *While deliberate indifference can be inferred from a single incident*
               when "the unconstitutional consequences of failing to train" are
8              "patently obvious," *Connick*, 563 U.S. at 61, 131 S.Ct. 1350, an
               inadequate training policy itself cannot be inferred from a single
9              incident.

10   *Hyde*, 23 F.4th at 874-75 (emphasis added).  Plaintiff is not asking the Court to infer anything

11   about the adequacy of Defendants' training from *Tennison*.  Plaintiff is only using *Tennison* for

12   the proposition that Defendants were on notice.  Moreover, as described above, *Tennison* describes

13   multiple incidents of Brady violations, not just one.  Defendants then argue:

14             Plaintiff fails to explain how the City could have notice to train the
               individual defendants based on a Ninth Circuit decision affirming
15             denial of summary judgment on qualified immunity grounds to
               individual police inspectors involved in a 1989-90 murder
16             investigation (not municipal liability) first filed weeks *after* the
               Barrett murder—potentially after the alleged 2008 meeting—and
17             amended shortly before Plaintiff was arrested.

18    (Dkt. No. 104 at 20.)  But this argument also fails.  First, the Court must interpret the facts in the

19   light most favorable to Heard at this stage.  The murder occurred on November 25, 2008.

20   *Tennison* came down on December 8, 2008.  Jackson speculated the meeting probably occurred

21   "within 30 days" of the murder.  (Dkt. No. 74-15 at 8.)  Viewing the evidence in the light most

22   favorable to *Heard,* the meeting could have occurred multiple weeks after *Tennison*.  Defendants

23   cite no case establishing a grace period for failure-to-train allegations.

24          Second, Defendants try to limit *Tennison's* force as merely "a Ninth Circuit decision

25   affirming denial of summary judgment on qualified immunity grounds" rather than a "municipal

26   liability" case. (Dkt. No. 104 at 20.)   This is just a circular argument.   If only municipal

27

28   ───────────────
     [6] The Ninth Circuit amended its decision on June 23, 2009. *See Tennison*, 570 F.3d 1078. The
     amended decision reaches the same result as the initial decision.

United States District Court
Northern District of California

violations could place a city on notice regarding municipal violations, no city would ever be held

accountable.  Defendants have not shown that a published decision condemning a pattern of

alleged *Brady* violations by individual SFPD officers does not put a municipality on notice that a

risk exists.

Thus, viewing the evidence in the light most favorable to Plaintiff, the City's motion for

summary judgment is DENIED.

## CONCLUSION

For the reasons stated above, Jackson, Burrows, Griffin, and the City's motion for

summary judgment is DENIED.   Lynch and Jones' motions for summary judgment are

GRANTED.  The parties shall schedule a further settlement conference with Chief Magistrate

Judge Ryu at a time to be determined by Magistrate Judge Ryu.   A further case management

conference is scheduled for September 21, 2023, at 1:30 p.m. by Zoom Video.

**IT IS SO ORDERED.**

This Order resolves Dkt. No. 74.

Dated: August 3, 2023

JACQUELINE SCOTT CORLEY
United States District Judge